**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul Burt,<br><br>        Plaintiff,<br><br>vs.<br><br>Broyhill Furniture Industries, Inc.,<br><br>        Defendant. | No. CV 04-2929-PHX-MHM<br><br>**ORDER** |

Plaintiff has sued Defendant Broyhill Furniture Industries, Inc., ("Defendant" or "Broyhill"), asserting claims based on violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213. (Doc. 2). Jurisdiction is based on federal question, 28 U.S.C. § 1331.

Defendant has filed a motion for summary judgment as to Plaintiff's ADA discrimination claims (Doc. 24), supported by a separate statement of facts. (Doc. 25). Plaintiff has filed an opposition response on summary judgment (Doc. 28), supported by a separate statement of facts (Doc. 28 - Attachment 1). Defendant has filed a reply (Doc. 38), supported by a supplemental statement of facts (Doc. 39). Defendant also has filed a controverting statement of facts. (Doc. 40).

The Court heard argument on Defendant's summary judgment motion on July 6, 2006. After considering the parties' pleadings, evidentiary support, and arguments, the Court enters this Order.

I.

Standard of Review.

A motion for summary judgment may be granted only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). To defeat the motion, the non-moving party must show that there are genuine factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986). The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e). See also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356 (1986).

II.

Background Facts.

Defendant, a North Carolina company, manufactures, imports and sells furniture to approved stores in the United States. Defendant hired Plaintiff as a sales representative on September 25, 1978. As with all of Defendant's sales representatives, Plaintiff contracted with Defendant to sell Defendant's product line within a certain sales territory. Plaintiff reported his sales activities to a Broyhill regional sales manager. Plaintiff sent weekly sales reports to Broyhill which included Broyhill stores visited and product sold. According to Defendant, Plaintiff called his sales manager once a week. More frequent weekly contacts were not required. Plaintiff received two weeks of training in 1978 regarding Broyhill's manufacturing process.

As a sales representative, Plaintiff set his own weekly schedule, determined the number of hours he worked per week, and made his own decisions regarding how to sell to

1   and service the Broyhill accounts within his territory. Plaintiff testified during his deposition
2   that his job was to sell the product and that it did not matter how much time he spent.
3   Plaintiff worked out of his home or was on site at a store within his territory. Plaintiff's
4   compensation derived from sales commissions. Between 1993 and 1998, Plaintiff was
5   Defendant's Salesman of the Year twice and its largest volume shipper for five years in a
6   row.

7   On March 23, 1999, Plaintiff signed a Broyhill Furniture Industries, Inc.,
8   Commissioned Sales Representative Agreement ("the 1999 Agreement"). The 1999
9   Agreement provided in relevant part that it was the parties' intention to create the
10  relationship of independent contractors:

> 1. Purpose. It is the intention of the parties to this Agreement to create between them the relationship of independent contractors. SALES REPRESENTATIVE is not a common-law employee of BROYHILL, but is an independent contractor. BROYHILL shall not have the right to require the SALES REPRESENTATIVE to do anything that would jeopardize the relationship of independent contractors between BROYHILL and the SALES REPRESENTATIVE. The SALES REPRESENTATIVE shall not conduct his/her business in any way which will give rise to an employer/employee relationship between the parties or with the other party's employees. The SALES REPRESENTATIVE shall perform the services described hereunder according to the SALES REPRESENTATIVE's schedule and at a location the SALES REPRESENTATIVE chooses so long as said services are timely and fully performed. ...

(Doc. 25, Defendant's Statement of Facts ("DSOF"), Exh. 5 at ¶ 1).

The 1999 Agreement further provided that Broyhill agreed to pay the sales representative a commission on product sold to customers located in the assigned territory. (id., at ¶ 5(a)). It also stated that "[t]he SALES REPRESENTATIVE understands and agrees that he/she is an independent contractor. Accordingly, BROYHILL shall not withhold any local, state or federal income taxes from commissions paid to the SALES REPRESENTATIVE." (id., at ¶ 7(a)). Under the Agreement, all expenses incurred by the sales representative in the performance of the Agreement were the sole responsibility of the sales representative. (id., at ¶ 10). Either party could terminate the Agreement "for any

- 3 -

1  reason, or for no reason, at any time upon thirty (30) days written notice to the other party."
2  (id., at ¶ 13(a)).

3        According to Defendant, Plaintiff read and understood the terms of the 1999
4  Agreement. Other of Broyhill's sales representatives signed similar agreements.
5        Plaintiff testified during deposition that he performed as an "independent contractor"
6  for Broyhill. Plaintiff's duties and responsibilities did not change and continued to include
7  selling Broyhill products within a contracted for sales territory. After Plaintiff signed the
8  1999 Agreement, Defendant paid him straight commissions for the products he sold in his
9  territory. Defendant did not pay Plaintiff a guaranteed income.

10       In 2000, Defendant began reporting Plaintiff's annual commissions on his W-2 form
11 as a "statutory employee." This type of reporting was consistent with the terms of the 1999
12 Agreement. (Doc. 25, Exh. 5 at ¶ 7(b)). Plaintiff reported the W-2 wages on his Schedule
13 C as business income. Plaintiff testified that because he "was working as an independent
14 contractor," expenses that had been paid by Broyhill in the past could now be deducted as
15 business expenses on an IRS Schedule C after he signed the 1999 Agreement. Between 1999
16 and 2004, Plaintiff deducted the following kinds of expenses on federal tax form Schedule
17 C: vehicle expenses, employee benefit programs, insurance, legal and professional services,
18 office expense, repairs and maintenance, travel, meal and entertainment expenses. Plaintiff
19 purchased a computer and other equipment necessary to operate as a sales representative and
20 deducted such expenses as business expenses on his Schedule C. After Plaintiff signed the
21 1999 Agreement, he was no longer eligible for sick or vacation time or Broyhill sponsored
22 retirement plans. Defendant no longer paid any sum toward Plaintiff's medical insurance.
23 Plaintiff scheduled his own time off and was not required to report it to Defendant.

24       In 1995, Plaintiff was diagnosed with polycystic kidney disease. On January 28,
25 2002, Plaintiff was hospitalized with a ruptured large intestine and was hospitalized for
26 approximately four weeks. While in the hospital, Plaintiff suffered renal failure and began
27 receiving dialysis. Also while hospitalized, Plaintiff agreed to have another Broyhill
28

1  commissioned sales representative, Rick White, assist in covering Plaintiff's sales territory.
2  Plaintiff paid White approximately $9,300 for the services White performed.

3        Plaintiff was released from the hospital in February 2002.  After his release, Plaintiff
4  scheduled dialysis sessions to occur three afternoons per week, on Tuesdays, Thursdays and
5  Saturdays.  These sessions lasted about four hours.  Plaintiff drove himself to these sessions.
6  Plaintiff continued to perform his sales representative functions during this time.

7        In April 2002, Defendant and Plaintiff agreed that Plaintiff's contracted sales territory
8  would include Arizona and half of New Mexico.  However, in May 2002, Plaintiff told Mr.
9  Dick Lewis, his regional sales manger, that he was having difficulty driving to Albuquerque,
10 New Mexico, and returning for his scheduled dialysis.  Plaintiff did not request a territory
11 change from Defendant.

12       Plaintiff had sold Broyhill product to M.D. Pruitt for over twenty years.  In 2002,
13 Pruitt's was the largest Broyhill customer in Maricopa County and accounted for 80 per cent
14 of Plaintiff's sales commissions in his territory.  In 2002, Plaintiff and Rick White were
15 selling Broyhill product lines in the same territory, including to Pruitt's.

16       In May 2002, Pruitt's owners, Mike and Roger Sensing, met with Broyhill regional
17 sales manager Mr. Lewis and informed him that Mr. White could no longer call on Pruitt's
18 because White had been seen trying to convince Broyhill to sell to Pruitt's competitor, The
19 Room Store.  It was agreed that White would be excluded from Pruitt's and that Plaintiff
20 would sell all of Broyhill's product line to Pruitt's.

21       In January 2003, Pruitt's began paying $1,000 to $3,000 per month in compensation
22 to Plaintiff for services Plaintiff provided directly to Pruitt's.  For the year 2003, Pruitt's
23 paid Plaintiff $27,000.  Plaintiff testified that he determined that he could receive income
24 from Pruitt's because his efforts there did not compete with his sales efforts on behalf of
25 Broyhill.

26       In or about June 23, 2002, Mr. Lewis and Plaintiff discussed Plaintiff's alleged use
27 of his personal account to sell Broyhill products to non-Broyhill customers.  Plaintiff had
28 used his personal account to order Broyhill product which he sold at a ten percent markup

- 5 -

1  to Consumer Plus and The Design Center, both non-Broyhill stores. Plaintiff admitted that
2  his sales to these stores violated Broyhill's policy regarding the use of personal accounts.
3  As a result of this alleged impropriety, Broyhill gave Plaintiff two options: (1) Plaintiff could
4  resign; or (2) Plaintiff's territory would be limited to selling only to Pruitt's in Phoenix.
5  Plaintiff chose the second option, selling only to Pruitt's in Phoenix. Plaintiff testified that
6  the "narrowing of [his] territory was a consequence of [his] personal account use" and not
7  a reasonable accommodation for his medical condition.

8        In the fall of 2002, Defendant offered Plaintiff all of Maricopa County as his sales
9  territory. In a letter dated November 30, 2002, Plaintiff wrote to Broyhill's Senior Vice
10 President of Sales, David Bannister, that an anticipated kidney transplant would not occur
11 before February 2003 at the earliest. Plaintiff stated that, considering the dialysis three times
12 per week, he "[felt] it best not to take on the additional accounts (Phoenix market) until after
13 the kidney transplant ..." On December 11, 2002, Mr. Lewis responded to Plaintiff's letter
14 stating that he agreed to Plaintiff's request that "the switch from one account, Sensing
15 [Pruitt's], to the entire Maricopa county be delayed" until Plaintiff's transplant was complete
16 and he was able to take over the "whole Territory."

17       In September 2003, Defendant decided to stop selling to Pruitt's and to commence
18 selling to The Room Store. Mr. Lewis informed Plaintiff of this decision to terminate
19 Broyhill's relationship with Pruitt's. Broyhill offered Plaintiff the sales territory of Arizona
20 and parts of New Mexico. Plaintiff told Mr. Lewis he would have a hard time traveling to
21 New Mexico. Broyhill then offered Plaintiff the sales territory of sharing The Room Store
22 account in Phoenix with Mr. White. Plaintiff testified that Broyhill gave him this account
23 "even though they really didn't want to do that."

24       On October 19, 2003, Mr. Lewis sent Plaintiff a contract addendum which provided
25 that Plaintiff could continue to be the sole sales representative for Pruitt's during the wind-
26 down for which he would receive 100 percent of commissions. The Addendum further
27 provided that Plaintiff would have the Upholstery/Leather sales representative position for
28 The Room Store for which he would receive 100 percent of commissions. Mr. White was

- 6 -

1  to receive commissions for the other products shipped to The Room Store. On October 25,
2  2003, Plaintiff countered by proposing a 40/60 commission split between himself and Mr.
3  White on all Broyhill product shipped to The Room Store.

4  On November 19, 2003, Plaintiff filed his first charge of discrimination with the
5  EEOC, Charge No. 350-2004-00823. Plaintiff claimed that Broyhill was discriminating
6  against him by offering him only the Upholstery/Leather line. Plaintiff testified that after he
7  filed his EEOC charge, Broyhill "gave [him] exactly what [he] wanted ..." Plaintiff and
8  Broyhill executed an Addendum to the 1999 Agreement incorporating Plaintiff's proposed
9  40/60 commission split. This Addendum became effective January 4, 2004. On December
10 23, 2003, the EEOC issued a no cause finding.

11 On January 20, 2004, Rick White informed Mr. Lewis that The Room Store owner,
12 Danny Selznick, had reported that Plaintiff had been heard making derogatory comments
13 about The Room Store. It was reported that Plaintiff had made these comments to Judy
14 Shull, a Room Store sales representative, who had reported the incident to store manager,
15 Gary Obertheu. Mr. Obertheu had discussed the matter with Mr. Selznick. Another such
16 reported incident of Plaintiff's derogatory remarks about The Room Store occurred in late
17 January 2004. On January 28, 2004, Broyhill Regional Manager David Bannister wrote
18 Plaintiff a letter advising him that if The Room Store "kicks you out, we will not have
19 another job for you." Mr. Selznick subsequently informed Mr. Lewis that Plaintiff was not
20 allowed in any Room Store location because of his alleged negative comments to Ms. Shull.
21 Mr. Lewis in turn informed Plaintiff that he was no longer to call on The Room Store.

22 Plaintiff was excluded from The Room Store account in February 2004. However,
23 Broyhill continued to pay Plaintiff 40 percent commission on all Broyhill product shipped
24 to The Room Store until June or July 2004. Plaintiff agreed he was receiving a "check for
25 doing nothing" for The Room Store. At this same time, Plaintiff received 100 percent
26 commissions from Pruitt's and $1,000 to $2,000 directly from Pruitt's.

27 According to Defendant, once Plaintiff was excluded from The Room Store, it had no
28 other available sales territories in Maricopa County. On June 1, 2004, Broyhill offered

1   Plaintiff as a sales territory the sale of all products to Broyhill stores in all counties of the
2   State of Arizona except Maricopa, Pima, Pinal, Cochise and Santa Cruz ("Arizona Territory")
3   at 100 percent commissions. In his deposition, Plaintiff acknowledged that in June 2004,
4   Broyhill had only two sales territories it could offer him, that is, the Arizona Territory, and
5   Tucson, Arizona, selling to Sam Levitz furniture stores. Plaintiff rejected the Arizona
6   Territory by refusing to sign the agreement. Plaintiff acknowledged that if he could not
7   handle The Room Store, his only option was to handle the Sam Levitz stores in Tucson.

8        At the time, Nancy White served as Broyhill's commissioned sales representative for
9   the Sam Levitz stores in Tucson, a position she had held since 2003. Plaintiff believed that
10  Broyhill should assign Ms. White to another territory and assign him to the Tucson sales
11  territory.

12       On June 1, 2004, Plaintiff filed a second charge of discrimination with the EEOC,
13  charge no. 350-2004-03768. Plaintiff claimed in this second charge that Defendant had
14  discriminated against him by offering him the Arizona Territory. Plaintiff testified that The
15  Room Store was not his complaint; rather, his complaint was that Defendant had chosen to
16  give him "a traveling job" and that he "deserved better treatment." Plaintiff testified that "it
17  was obvious that they were trying to put me out and didn't look and try to find an opportunity
18  for me."  On September 22, 2004, the EEOC issued a no cause determination as to this
19  second charge of discrimination.

20       On July 20, 2004, Broyhill notified Plaintiff by letter that he had voluntarily
21  terminated his representation of the Broyhill line because he had not signed the agreement
22  regarding the Arizona Territory within 30 days. On December 20, 2004, Plaintiff filed a
23  third charge of discrimination with the EEOC, charge no. 350-2005-01214, claiming
24  retaliation. Plaintiff testified during deposition that Defendant had retaliated against him for
25  filing the first charge of discrimination, not the second charge. Plaintiff testified that Lewis
26  and Bannister were trying to get rid of him but he did not know why. On January 7, 2005,
27  the EEOC issued a no cause finding as to Plaintiff's third charge of discrimination.
28

1    In his statement of facts in support of his response on summary judgment based on
2 Plaintiff's deposition testimony, his affidavit and documents, Plaintiff contends that he was
3 discriminated against as a result of the 1999 Agreement based on his disability and that
4 Defendant favored another of its sales representatives, Rick White.  Mr. White had moved
5 to Arizona from Missouri in 2001.  Plaintiff claims that Mr. White had trouble meeting his
6 sales quotas but that Plaintiff did not.  According to Plaintiff, Mr. Lewis asked Plaintiff to
7 train Mr. White.  Plaintiff claims he was better qualified for the promotion to lead
8 representative at The Room Store.  Plaintiff contends that these discriminatory acts taken by
9 Defendant were the result of Plaintiff's disability and so Plaintiff filed a charge of
10 discrimination on November 19, 2003 and that eight months later, on July 20, 2004,
11 Defendant terminated his employment.  Plaintiff claims that his dialysis set the terms of his
12 work schedule, that is, Plaintiff was extremely weak, light-headed and nauseous after each
13 treatment, long distant drives caused extreme drowsiness and he developed blood clots that
14 caused extreme dizziness.

15    Plaintiff states that as a sales representative for Defendant, he was subject to the
16 direction of Defendant's sales managers, Dick Lewis and David Bannister. Mr. Lewis
17 conducted annual performance evaluations and expected Plaintiff to submit reports.  Mr.
18 Lewis also required Plaintiff to call him every day.  Defendant imposed budget quotas on
19 Plaintiff.  Mr. Lewis required Plaintiff to attend the international furniture market each year
20 in North Carolina and regional sales seminars in 2001 and 2002.  Plaintiff testified during his
21 deposition, however, that it was possible not to attend regional markets.  Plaintiff claims that
22 Defendant furnished the "equipment" and catalogs that Plaintiff used to sell Broyhill
23 furniture and required its sales representatives to purchase lap top computers.

24    Plaintiff states that Broyhill provided its sales representatives with some employee
25 benefits. In support of this statement, Plaintiff has attached a letter dated March 31, 2004
26 addressed to "Fellow Employee" from Dennis R. Burgette, a representative of Broyhill
27 Furniture Industries, Inc., In this letter, Mr. Burgette has provided a Profit Sharing Plan
28 statement.  (Doc. 28-Attachment 1, Plaintiff's Statement of Facts, Exh. 11).  Another

- 9 -

1  attachment to Plaintiff's Exhibit 11 appears to be Plaintiff's statutory commissions statement
2  dated "4/15/2004" which shows deductions for federal withholding, medical and dental
3  benefits. (id.). Defendant has objected to Plaintiff's Exhibit 11 because it was not provided
4  during discovery and has not been authenticated.

5  In its supplemental statement of facts, Defendant states that a company policy
6  prevented married couples from working together in the same sales territory. Defendant
7  states that Plaintiff was aware of this company policy.

## III.

### Discussion.

10 In his First Amended Complaint, Plaintiff alleges that since the time of his
11 hospitalization in February 2002, Defendant has engaged in unlawful employment practices
12 under the ADA that include the following: (i)"treating defendant's other sales representatives
13 more favorably than plaintiff;" "altering or attempting to alter company policies and
14 procedures in ways that would reduce plaintiff's income;" "failing to reasonably
15 accommodate plaintiff;" "retaliating against him in various ways;" "and retaliating against
16 him by discharging him from his position with the company." (Doc. 2 - First Amended
17 Complaint at ¶ 13). In support of Plaintiff's ADA claims, Plaintiff contends that Defendant
18 took these unlawful actions by offering him the Arizona Territory instead of his preferred
19 accommodation of the Tucson sales territory.

20 Defendant claims that it is entitled to summary judgment on Plaintiff's ADA claims,
21 arguing as its first ground that Plaintiff was not an employee of Defendant but an
22 independent contractor and therefore not entitled to the protections afforded an "employee"
23 under the ADA. Alternatively, Defendant contends that even if Plaintiff is found to be an
24 "employee" of Defendant, he is not otherwise eligible for the protections of the ADA because
25 (i) he has failed to allege that he is disabled within the meaning of the ADA, (ii) he cannot
26 show that Defendant treated him less favorably than other sales representatives because of
27 his disability; (iii) Defendant engaged in an interactive process and offered Plaintiff
28

1  reasonable accommodation even though it had no duty to do so: and (iv) there is no evidence
2  of retaliation.

3        (A).  <u>Plaintiff's status an independent contractor or employee of Defendant</u>.

4      The ADA prohibits employers from discriminating "against a qualified individual
5  with a disability because of the disability in regard to ... advancement, or discharge of
6  employees, employee compensation, ... and other terms, conditions, and privileges of
7  employment." 42 U.S.C. § 12112(a). The ADA by definition protects only an "employee"
8  and defines "employee" to mean "an individual employed by an employer." 42 U.S.C. §
9  12111(4).  The determination of whether a plaintiff is an employee or an independent
10 contractor is a question of law, while the existence and degree of the legal factors to be
11 considered is this determination are questions of fact. <u>Brock v. Superior Care, Inc.</u>, 840 F.2d
12 1054, 1059 (2d Cir. 1988).

13     In <u>Nationwide Mutual Ins. Co. v. Darden</u>, 503 U.S. 318 (1992), a case filed under the
14 Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq., the
15 Supreme Court indicated that where a statute containing the term "employee" does not
16 helpfully define it, the common law agency test should be applied. <u>Id</u>., at 323-24. In <u>Walters</u>
17 <u>v. Metropolitan Educ. Enter. Inc.</u>, 519 U.S. 202, 211 (1997), the Supreme Court indicated
18 without explicitly holding that the term "employee" under Title VII is defined by "traditional
19 principles of agency law." In <u>Community for Creative Non-Violence v. Reid</u>, 490 U.S. 730
20 (1989), the Court identified the following factors as relevant to the determination of whether
21 an individual is an "employee" or an "independent contractor" applying the general common
22 law of agency:

> the hiring party's right to control the manner and means by which the product is accomplished; ... the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

- 11 -

Id., at 751-52. The Supreme Court set out these same common law agency factors in Darden, 503 U.S. at 323-24.

The definition of "employee" under the ADA leaves the term essentially undefined. Moreover, the definitions of "employer" and "employee" under the ADA are identical to those under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. Title VII cases therefore are instructive on the issue. Wells v. Clackamas Gastroenterology Associates, P.C., 271 F.3d 903, 904-05 (9th Cir. 2001).

Prior to the Supreme Court decisions cited above, the Ninth Circuit held that the "economic realities" test enunciated in Lutcher v. Musician Union Local 47, 633 F.2d 880, 883 (9th Cir. 1980), a Title VII case, was to be employed to determine whether a worker is an employee or an independent contractor. The primary focus of the Lutcher test is the extent of the employer's right to control the means and the manner of the worker's performance. Id. Other factors to be considered include the kind of occupation and degree of supervision; the skill required in the particular occupation; whether the employer or the individual furnishes the equipment and place of work; the length of time the individual has worked; the method of payment, such as by time or by job; the manner in which the relationship is terminated; whether annual leave is afforded; whether the work is an integral part of the business of the hiring party; whether retirement benefits are afforded; whether the "employer" pays social security taxes; and the intention of the parties. Lutcher, 633 F.2d at 883 n.5 (quoting Spirides v. Reinhardt, 613 F.2d 826, 831 (D.C.Cir. 1979)).

The Ninth Circuit has not explicitly held that the rationale of Darden and Walters applies within this Circuit in the determination of whether a plaintiff is an "employee" or an "independent contractor" in an ADA case. The analysis of employment status for purposes of Title VII under Lutcher, however, is not materially different from the common-law agency standard applied by the Supreme Court. Moreover, as Defendant points out, the Ninth Circuit applied the Darden factors "for purposes of determining employee status" in Barnhart v. New York Life Ins. Co., 141 F.3d 1310 (9th Cir. 1998), a case brought under the Age

- 12 -

1  Discrimination in Employment Act ("ADEA") and ERISA.  The ADEA, like the ADA and
2  Title VII, defines an employee as "any individual employed by an employer."  29 U.S.C. §
3  630(f).

4  In this case, upon consideration of the above factors, the following facts are
5  undisputed.  Plaintiff testified that after signing the 1999 Agreement he worked as an
6  independent contractor.  The 1999 Agreement expressly labeled Plaintiff as an independent
7  contractor.  See Adcock v. Chrysler Corp., 166 F.3d 1290, 1293 (9th Cir. 1999)(language in
8  a contract "though not dispositive, reflects the parties intention that Adcock would have been
9  an independent contractor, not an employee"). The 1999 Agreement provided that either
10 party could terminate the agreement for any reason, or for no reason, at any time upon thirty
11 days written notice to the other party.  The 1999 Agreement allowed Plaintiff to accept
12 income from other sources and Plaintiff did in fact do so, that is, the $27,000 in income
13 Plaintiff received from Pruitt's in 2003.

14 Plaintiff indicated to the federal and state governments on his tax returns that he
15 deserved tax status as a self-employed businessman entitled to deduct expenses.  Plaintiff
16 supplied his own transportation, office supplies and other instrumentalities and tools
17 necessary to accomplish the task of selling Defendant's product line.  Plaintiff deducted the
18 associated expenses as business expenses.

19 Plaintiff testified that he determined when and how he would do his work.  Plaintiff
20 did not work at a Broyhill office but worked out of his home or at a customer site.  Defendant
21 paid Plaintiff straight commission.  For purposes of Plaintiff's status as a statutory employee
22 under the Tax Code and pursuant to the terms of the 1999 Agreement, Defendant withheld
23 Social Security, Medicare and federal unemployment taxes.  See Weary v. Cochran, 377 F.3d
24 522, 527 (6th Cir. 2004)(a "statutory employee" which under the Tax Code requires a person
25 to be a non-employee may support the finding of independent contractor status).  After the
26 1999 Agreement, Defendant no longer provided life insurance, retirement benefits, sick or
27 vacation pay, or made payments for medical insurance.  While Plaintiff was hospitalized in
28

1 January and February 2002, he paid Mr. White, another of Defendant's sales representatives,
2 $9,300 for White's services in covering Plaintiff's territory.

3 Defendant has acknowledged that one factor -- Plaintiff's longstanding relationship
4 with Defendant -- can be said to suggest employee status. This one factor, however, is far
5 outweighed by the numerous factors discussed above which indicate that Plaintiff was an
6 independent contractor. Moreover, Plaintiff's longstanding relationship with Defendant is
7 not dispositive. See, e.g., Holtzman v. The World Book Company, Inc., 174 F. Supp.2d 251,
8 257 (E.D.Pa. 2001)(holding that, despite longstanding relationship with World Book,
9 plaintiff was independent contractor where, *inter alia*, she had complete discretion over when
10 and how to work, she worked out of her home, she was no longer provided a company car,
11 she bought her own office supplies, she was paid commissions not a salary, and she received
12 no health or retirement benefits).

13 In his response, Plaintiff argues that his status was that of employee because he was
14 required to report to Defendant's Regional Sales Manager Dick Lewis who conducted annual
15 performance evaluations relevant to Plaintiff's work. Defendant also imposed quotas on
16 Plaintiff's sales and required Plaintiff to attend regional sales seminars and furniture markets.
17 Defendant's managers from time-to-time referred to Plaintiff as a "Broyhill employee."
18 Defendant also provided company catalogs and required Plaintiff to purchase a laptop
19 computer. These individual factors, if true, do not minimize the importance of the
20 undisputed facts already discussed. Plaintiff had discretion regarding when and how to
21 perform his duties and responsibilities without day-to-day intrusion from Defendant, he
22 reported his taxable income as a self-employed businessman entitled to deduct expenses, he
23 worked out of his home, and he signed an agreement in which he acknowledged his status
24 as independent contractor. The Court concludes that a reasonable jury could only find that
25 the objective, legal reality of Plaintiff's status was that of an independent contractor, not an
26 employee. Defendant's motion for summary judgment is granted.

27      (B). <u>Defendant's alternative argument that Plaintiff has not shown Disability Discrimination</u>.
28

1  The Court has determined it appropriate to consider Defendant's alternative argument
2  that Plaintiff has not shown disability discrimination.  For a plaintiff to prevail on a disability
3  discrimination claim based on the ADA, the plaintiff must show (1) that he is disabled within
4  the meaning of the ADA, (2) that he is qualified, that is, that with or without reasonable
5  accommodation (which he must describe),  he is able to perform the essential functions of
6  the job, and (3) that he was terminated because of his disability.  Kennedy v. Applause, Inc.,
7  90 F.3d 1477, 1481 (9th Cir. 1996).  The traditional framework for analyzing Title VII cases
8  applies in ADA cases.  Hernandez v. Hughes Missile Systems Company, 362 F.3d 564, 568
9  (9th Cir. 2004).  Plaintiff bears the  burden of proving by a preponderance of the evidence that
10 his disability actually played a role in the employer's decision-making process and had a
11 determinative influence on the outcome. Plaintiff may meet this burden by showing that the
12 defendant employer's proffered explanation for the employment decision is unworthy of
13 credence.  Id.

14  Defendant contends that, even it can be found that Plaintiff was an employee of
15 Defendant, Plaintiff has not identified a "physical or mental impairment" that "substantially
16 limits" one or more major life activity, although Defendant appeared to withdraw this
17 contention at the hearing. Defendant further contends that Plaintiff has not shown that his
18 relationship with Defendant was terminated because of his disability.

19  In his First Amended Complaint, Plaintiff alleges that he "is a qualified individual
20 with a disability (dysfunctional kidneys which necessitate dialysis three days each week)."
21 (Doc. 2, at p. 1).  Plaintiff further alleges that this "kidney impairment" "has substantially
22 limited him in several major life activities."  (id., at ¶ 12).  Plaintiff asserts that "during all
23 times relevant to this lawsuit, [he] has been qualified to perform the essential functions of the
24 Sales Representative position he had held at Broyhill since 1977." (id.).  It appears that the
25 reasonable accommodation that Plaintiff contends should have been provided was his
26 assignment as sales representative to the Tucson Territory as opposed to the Arizona
27 Territory.
28

- 15 -

The undisputed facts show that, following Plaintiff's hospitalization in February 2002 regarding his kidney condition, Plaintiff agreed that his sales territory would include Arizona and half of New Mexico. In May 2002 Plaintiff complained that he was having difficulty driving to Albuquerque, New Mexico but he did not request a territory change. In May 2002, Plaintiff became Defendant's exclusive representative for selling Broyhill's product line to Pruitt's. In June 2002, following the revelation that Plaintiff had misused his personal account, Defendant gave Plaintiff the option of resigning or being the exclusive sales representative for Pruitt's. Plaintiff chose the latter option, testifying that this "narrowing of his territory" was the result of his improper personal account use, not a reasonable accommodation for his medical condition. In the fall of 2002, when Defendant offered Plaintiff all of Maricopa County as his sales territory, Plaintiff requested a delay in taking on additional accounts in anticipation of his kidney transplant in February 2003. Defendant accommodated Plaintiff's request.

In September 2003, when Defendant made a business decision to stop selling to Pruitt's and to commence selling product to The Room Store, Defendant offered Plaintiff the sales territory of Arizona and parts of New Mexico. When Plaintiff complained that it would be difficult for him to travel to New Mexico, Defendant offered Plaintiff as his sales territory the sharing of The Room Store account with Rick White. Defendant also agreed to an addendum to Plaintiff's contract which provided that Plaintiff would continue to be the sole sales representative for Pruitt's during the wind down period. Defendant further agreed to Plaintiff's counter proposal that he receive a 40/60 commission split on all Broyhill product shipped to The Room Store, effective January 2004.

However, as a result of Plaintiff's derogatory comments about The Room Store, he was excluded from the account in February 2004. Nonetheless, Broyhill continued to pay Plaintiff 40 percent commission on all Broyhill product shipped to The Room Store until June or July 2004. Plaintiff admitted he was receiving a "check for doing nothing" for The Room Store. At this same time, Plaintiff was receiving 100 percent commissions from Pruitt's and $1,000 to $2,000 directly from Pruitt's.

- 16 -

After Plaintiff was excluded from The Room Store because of his negative comments, Defendant offered Plaintiff the Arizona Territory which Plaintiff rejected. Plaintiff claims instead that he should have been assigned to the Tucson sales territory which already was being serviced by Nancy White. Under the ADA, "[r]easonable accommodation may include 'job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, ... ." Ransom v. State of Arizona Board of Regents, 983 F. Supp. 895, 899 (D.Ariz. 1997)(quoting 42 U.S.C. § 12111(9)(B)). "Reassignment to accommodate a disabled employee should not bump another employee from his or her position." Id., at 901.

In any event, Plaintiff's need for a new sales territory came about as a result of his alleged derogatory comments about The Room Store, not as a result of his alleged disability. The undisputed evidence shows that Mr. Selznick, owner of The Room Store, informed Defendant's manager Mr. Lewis that Plaintiff was not to call on The Room Store because of Plaintiff's negative comments. The undisputed evidence further shows Defendant's efforts to accommodate Plaintiff in his capacity as sales representative and in light of Plaintiff's kidney impairment.

In his response, Plaintiff contends that Defendant favored Rick and Nancy White over him as a result of Plaintiff's disability. Plaintiff further contends that he, not Mr. White, should have been promoted to lead representative at The Room Store and that his failure to receive such promotion was discriminatory due to his disability. Plaintiff has not shown by any evidence that these events came about as a result of Defendant's discrimination against Plaintiff on account of disability. On the contrary, Defendant on several occasions accommodated Plaintiff regarding his duties as sales representative and his kidney condition.

Defendant has offered legitimate, non-discriminatory reasons for refusing to fulfill Plaintiff's demand concerning re-assignment to the Tucson territory. Plaintiff has not offered any evidence that Defendant's proffered reasons are pre-textual.

Retaliation Claim.

Finally, Defendant contends that the evidence does not support Plaintiff's ADA claim based on retaliation. Plaintiff claims that he was retaliated against as a result of the filing of his first charge of discrimination on November 19, 2003 and that he suffered adverse employment action in the form of undesirable reassignment and discharge.

To make out a prima facie case of retaliation in violation of the ADA, a plaintiff must show "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." Brown v. City of Tucson, 336 F.3d 1181, 1187 (9th Cir. 2003); 42 U.S.C. § 12203(a). Plaintiff testified in his deposition that after he filed his November 2003 EEOC charge, Defendant "gave [him] exactly what [he] wanted" which was the 40/60 commission split between Plaintiff and Mr. White on all Broyhill product shipped to The Room Store. By February 2004, however, Plaintiff had been excluded from The Room Store by its owner Mr. Selznick for making derogatory comments about the store. Plaintiff's relationship with Defendant ended when Plaintiff refused to sign the agreement regarding the Arizona Territory in July 2004, some six months later. Plaintiff has not shown a causal link between his filing of the November 2003 charge of discrimination and the termination of his sales representative relationship with Defendant.

Plaintiff has failed to establish a genuine issue as to any material fact that would defeat Defendant's motion for summary judgment on Plaintiff's ADA claims. Defendant's motion for summary judgment on Plaintiff's ADA claims is granted.

**Accordingly**,

**IT IS ORDERED** that Defendant's motion for summary judgment as to Plaintiff's ADA claims (Doc. 24) is granted.

**IT IS FURTHER ORDERED** that Judgment shall be entered in favor of Defendant and that Plaintiff shall take nothing by way of his First Amended Complaint.

DATED this 18th day of September, 2006.

_____
Mary H. Murguia
United States District Judge